UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

LAURIE A. DALTON,

        Plaintiff,

      v.                      Case No. 06-C-0348

AIRTRAN AIRWAYS,

        Defendant.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. # 21)

        Plaintiff, Laurie A. Dalton, was employed by defendant AirTran Airways between July 19, 2002, and October 6, 2003. She alleges that during her employment she was subjected to a hostile work environment due to sexual harassment,[1] unlawful retaliation, and interference with her rights under the Family and Medical Leave Act (FMLA). She brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and the FMLA, 29 U.S.C. § 2601 et seq. Before the court is AirTran's motion for summary judgment on all claims.

SUMMARY JUDGMENT STANDARD

        Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving

---

[1] In response to arguments presented by AirTran in its opening brief, Dalton clarified that she was bringing a claim of hostile work environment based on sex, rather than separate claims of sex discrimination and sexual harassment. (*See* Pl.'s Combined Br. in Opp. at iii.)

party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## BACKGROUND[2]

---

[2] Five related cases, including this one, were brought by former AirTran employees against AirTran—*Dalton v. Airtran Airways*, Case No. 06-CV-348 (E.D. Wis; *Jensen v. AirTran Airways,* Case No. 06-CV-350 (E.D. Wis.); *Henneman v. AirTran Airways*, Case No. 06-CV-368 (E.D. Wis.); *Ott v. AirTran Airways*, Case No. 06-CV-371 (E.D. Wis.); *Cain v. AirTran Airways*, Case No. 06-CV-489 (E.D. Wis.). While these cases have not been consolidated, the defendants moved for summary judgment in all cases, and the parties consolidated briefing for all summary judgment motions. This resulted in nearly 1300 proposed findings of fact submitted by the parties (293 for the defendants, 1096 by the plaintiffs), along with several thousand pages of response materials and supporting documents. And, while the parties have submitted a very limited set of stipulated facts, most of their proposed findings of fact are disputed. Navigation of the record has therefore been a substantial and time-consuming endeavor.

    With that in mind, the court has relied on the parties' set of stipulated facts, as well as

2

AirTran is a low-fare commercial airline that has operated out of Milwaukee since June 2002. It has corporate offices in Orlando, Florida and Atlanta, Georgia. The Milwaukee station operates with about twenty-five employees. This includes a station manager, which is the top spot, followed by two or three station supervisors. All other employees carry the title of customer service agent.

Laurie Dalton was a customer service agent for AirTran in Milwaukee between July 19, 2002, and October 6, 2003. Dalton's fellow customer service agents included James Lipsey, who worked for AirTran from July 2002, to April 28, 2005; Larry Moore, who worked for AirTran from July 2002, to August 28, 2003; and Wes Davis, who worked for AirTran starting in February 2003. In addition, Victoria Jensen, Susan Henneman, Tami Ott, and Latrina Cain (who are all plaintiffs in related actions against AirTran) were employed by AirTran in Milwaukee as customer service agents. Jensen, who is Dalton's daughter, worked for AirTran between July 19, 2003, and October 6, 2003; Henneman between May 31, 2002, and January 26, 2004; Ott between May 31, 2002, and August 9, 2005; and Cain between July 31, 2003, and November 4, 2003.

Terese Sellers was the station manager for AirTran between March 6, 1999 and February 4, 2005. David Fox, who had served as a station supervisor between July 2002, and January 2006, became the station manager in January 2006. Tom Cross was a station supervisor for AirTran from May 31, 2002, to October 13, 2006.

---

each side's proposed findings of fact to the extent that they are undisputed, or that any alleged dispute is immaterial, unsupported, or otherwise not compliant with the local rules. Stipulated proposed findings of fact are designated as "SPFOF"; Defendant's proposed findings of fact are identified as "DPFOF"; and plaintiff's proposed findings of fact are identified as "PPFOF."

Decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the station manager in Milwaukee or a human resources officer at AirTran's corporate headquarters. Station supervisors may assign personnel to various tasks and may issue Employee Discipline Reports and Attendance Review Forms (reflecting absences or tardiness). For the most part, station supervisors perform their tasks alongside customer service agents.

Customer service agents perform various duties, including issuing tickets and boarding passes; checking baggage; assisting passengers boarding and exiting aircraft; loading and unloading bags at the ticket counter, gate, and aircraft; cleaning aircraft; security; marshaling aircraft; and otherwise providing service to customers. (DPFOF ¶ 12.[3]) These duties are performed at three principle areas: the passenger ticket counter, the flight gate, and the flight tarmac (also referred to as "ramp" duties). (DPFOF ¶ 23; Dalton 8/3/06 Dep. 44.[4]) All customer service agents are trained to work in these three areas because staffing levels necessitate that each employee be prepared to work in any area during a given week, and to move from one area to another during a given day.

---

[3] Of note, many of the plaintiff's responses to the defendant's proposed findings of fact do not comply with Civil Local Rule 56.2(b)(1) (in effect prior to February 1, 2010). That Rule provides that materials in opposition to a summary judgment motion must include "A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Often, the court is left to wonder what aspects of a proposed finding of fact are actually disputed, why they are disputed, and what evidence specifically calls the proposed fact into dispute. Without proper objections, such proposed findings may be deemed admitted for purposes of the summary judgment motion.

[4] Dalton's deposition testimony is separated into three volumes, which are designated by date. The first volume is the deposition of August 3, 2006; the second volume is the deposition of September 13, 2006; and the third volume is the deposition of September 29, 2006.

(DPFOF ¶ 25.[5])  Dalton worked in each of the various areas during her employment with AirTran.  (Dalton 8/3/06 Dep. 44.)

Some of the tasks associated the customer service position involve heavy lifting and general physical labor.  The job description for a customer service agent includes, among other things, the ability to work indoors and outdoors with strength and stamina to endure standing for an entire shift, the ability to lift and move items up to seventy pounds repetitively, as well as the ability to climb, bend, kneel, crawl, and stoop frequently.  (Fox Decl. ¶¶ 24-26, Def.'s Ex. 8.)  This is particularly true on the ramp, though agents working at the counter or the gate often have to move or assist with luggage. (DPFOF ¶ 29; Dalton 8/3/06 Dep. 51.)  Agents wear different uniforms depending on whether they are working the ramp or the ticket counter, and may be required to change clothes to assist in another area during a shift.  (*See* DPFOF ¶ 27.)

In addition, at certain times, AirTran assigned personnel to the "operations center," where agents perform administrative tasks related to incoming and outgoing flights; and to "baggage services," where agents work in the baggage claim area and in AirTran's lost baggage office.  (SPFOF ¶¶ 32-35.) Further, agents were assigned regularly to an area known as the "bag room," which is part of the "ramp" assignment.  In the bag room, agents load bags from the ticket counter conveyor belt onto carts for transport to the tarmac, and load and unload bags relative to aircraft and the baggage claim carousel. (DPFOF ¶ 31.)  As opposed to the tarmac, the bag room is protected from the elements,

_____

[5] Dalton "denies" this proposed fact, but (1) she does submit a proper objection pursuant to Civil Local Rule 56.2(b)(1), and (2) the proposed findings of fact that she cites in support of her "denial" (or the evidence supporting these proposed facts) do not speak to this point.  (*See* Pl.'s Resp. to DPFOF ¶ 25.)

5

heated in the winter and cooled in the summer. Agents in the bag room routinely interact with agents on the ramp and the ticket counter. (*Id*. ¶¶ 31-32.)

Occasionally, certain agents were assigned only to the ticket counter or gate (as opposed to the ramp) for short periods while recovering from injury. (DPFOF ¶¶ 46-48; PPFOF ¶¶ 63, 73.) Agents understood this to be "light duty," though AirTran had no official "light duty" assignment. (*See* PPFOF ¶ 57; DPFOF ¶ 44.) Instead, AirTran's policy was to work with agents to assess whether modified duty may be available to the agent recovering from an on-the-job injury, though such modified duty is not guaranteed and varies from case to case. (DPFOF ¶ 11.) In early 2003, AirTran station managers were informed that extensive modified duty assignments were affecting the efficiency of the airline's operations, and the Milwaukee station limited light duty assignments thereafter. (*Id*. ¶ 49-50.)

AirTran maintained written employment policies in its Crew Member Handbook, which was updated periodically. (*See* Def.'s Ex. 1.) Specifically, it included written policies regarding equal employment opportunities and sexual harassment. For the most part, all new AirTran employees receive a copy of the then-current Handbook during their initial company training in Atlanta. This was true for Dalton, Jensen, Henneman and Cain. (SPFOF ¶ 26). Updated versions of the Handbook are mailed to each station and distributed to the employees. (DPFOF ¶ 17.) In addition, electronic versions of the Handbook are available online through the company's intranet service, and the company's anti-harassment policies were posted throughout the employee break areas and behind the ticket counter. (*Id*. ¶¶ 18-19.)

6

As noted, Dalton started work as a customer service agent at AirTran in July 2002. During initial training in Atlanta, Dalton, along with Jensen, Henneman, and Ott, took part in sexual harassment training. (SPFOF ¶¶ 28.) These included instructions on what constitutes harassment, and the means of reporting such harassment. (DPFOF ¶ 20.)

On January 4, 2003, Dalton injured her back while working at AirTran. As a result, she was issued medical restrictions by her physician on January 6, 2003, prohibiting her from lifting, pushing, or pulling over fifteen pounds and bending more than six times per hour. On January 7, 2003, Dalton was allowed to work the ticket counter (light duty), but Sellers advised her that she would not be able to continue on light duty or bid on future work assignments with the restrictions issued by her doctor. The next day, January 8, 2003, Dalton's physician lifted her restrictions.

On February 17, 2003, Dalton visited a physician regarding an injury to her left shoulder. Her physician recommended that she engage in sedentary work until March 10, 2003. In early June 2003, Dalton again visited a physician, this time regarding her back. Although her physician recommended that she engage in sedentary work until June 15, 2003, Dalton did not request light duty or modified work assignments during these periods.

On July 23, 2003, Dalton injured her shoulder while lifting a heavy bag. (PPFOF ¶ 225). Her physician informed her on July 28, 2003, that she should refrain from work for a week. Dalton was cleared to return to work on July 31, 2003, but she was restricted in the use of her left arm.

However, Dalton did not return to work after July 25, 2003. While she did not request leave for her shoulder injury, she had been approved for leave, related to her mother's health concerns, commencing August 1, 2003.

Around September 2003, the management of the Milwaukee station was informed that it needed to furlough several employees immediately to accommodate a reduced flight schedule. (Morris Decl. ¶ 31; DPFOF ¶ 61.) Agents at the Milwaukee station were informed by a memorandum dated September 17, 2003, that the number of positions would be reduced through voluntary transfers or furloughs. (Def.'s Ex. 26; DPFOF ¶ 62.) Six customer service agents were to be laid off.

AirTran's policy provided that employees would be chosen for furlough on the basis of performance, attendance, ability to work, and, lastly, seniority. (Morris Decl. ¶ 31; Def.'s Ex. 26; DPFOF ¶ 64.) Effective October 6, 2003, Dalton, Customer Service Agents Carrie Jackson, Victoria Jensen, Duane Lettow, Michelle Roska, and Virnita Wilturner were selected for furlough and laid off. (Fox Decl. ¶ 46; DPFOF ¶¶ 65-66.)

Dalton filed her administrative charge of discrimination with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), on January 28, 2004 and cross-filed with the Equal Employment Opportunity Commission (EEOC). (SPFOF ¶ 43; PPFOF ¶ 277.) A few months later, on March 2, 2004, Dalton was notified by AirTran that she was being recalled to work. (SPFOF ¶¶ 40-41.) She responded that she was not cleared to return to work without medical restrictions. On May 10, 2004, AirTran's Worker's Compensation administrator informed Dalton that the results of a recent medical examination showed that she had recovered fully from her July 23, 2003 injury, and that she was cleared to return to work without restrictions. On May 14 and May 21, 2004,

8

AirTran informed Dalton that she was expected to return to work on May 24, 2004, and that failure to return would be considered a voluntary resignation. Dalton did not report to work on May 24, 2004.

Dalton was issued a Notice of Right to Sue from the EEOC on March 10, 2006. (PPFOF ¶ 279.) She subsequently initiated this action.

DISCUSSION

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), and discrimination against an employee for opposing a practice otherwise made unlawful under Title VII, 42 U.S.C. § 2000e-3(a). Discrimination under Title VII includes sexual harassment in the workplace, *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006), and retaliation against an employee because the employee has complained of illegal discrimination, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

A. Hostile Work Environment

To establish a prima facie case of hostile work environment based on sexual harassment, a plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Kampmier*, 472 F.3d at 940. Here, AirTran does not dispute that Dalton can meet the first and second prongs of the prima facie case. Instead, it contends that Dalton cannot meet the third prong—that any alleged harassment was sufficiently severe as to create a hostile or abusive atmosphere.

9

"In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2004) (quoting *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336 (7th Cir. 2001)). To do so, she must show that it "was both objectively and subjectively offensive." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). As to objective hostility, "[c]ourts look to several factors . . . including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Kampmier*, 472 F.3d at 941 (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)). "In other words, the environment must be 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting *Cerros v. Steel Techs.*, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002)).

"[T]he line between actionable and nonactionable sexual harassment 'is not always easy' . . ."; it is not governed by a "mathematically precise test." *Robinson*, 351 F.3d at 329. "The 'occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)). However, when the offensive conduct is proved to be so severe, even isolated incidents may potentially create a hostile work environment for the employee. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002).

10

Here, Dalton complains of harassment by several coworkers and supervisors, and the picture she paints is extensive. Specifically, Dalton takes aim at various actions by coworkers Lipsey, Moore, and Davis between July 2002, and early 2003, including comments about her sexual history, numerous come-ons, and confessions that they wanted to have sex with her (though in much less gentle terms). (*See* DPFOF ¶¶ 128-32.) Dalton recounts that in July 2002, Lipsey and Moore made a bet regarding who would be the first to have sex with her. (SPFOF ¶ 128). In addition, Davis told Dalton repeatedly that he wanted to have sex with her daughter, Victoria Jensen. Also, Dalton overheard Lipsey and Moore make graphic sexual comments about Jensen, Henneman, and others at AirTran, and discuss their sexual exploits in graphic detail in front of Dalton and others. Further, Davis made several unwelcome sexual comments to Dalton, asserting that he wanted to "fuck her" and that he "loved her ass."

Dalton also observed her coworkers viewing pornography on company computers. For example, she saw Lipsey viewing pornography on computers in Sellers' office, at the ticket counter, and in the operations area in November 2002 and January 2003. (SPFOF ¶¶ 132-34; DPFOF ¶ 139.) Moreover, Dalton observed Davis viewing pornography on a computer in the gate area in February 2003. (DPFOF ¶ 147.) Once, in November 2002, Dalton witnessed Lipsey and Moore viewing pornography on the computer in the operations center; Lipsey looked up at Dalton and asked her to take her clothes off so that they could take pictures of her and post them on the Internet. (DPFOF ¶ 137; PPFOF ¶ 331.)

In addition, Dalton was physically assaulted by her coworkers. Dalton recalled on January 23, 2003, Lipsey grabbed her hair while she was sitting down at the

11

computer and pushed her up on the counter. He told her he was "going to fuck [her]," bent her over, and began rubbing himself against her. (PPFOF ¶ 318; DPFOF ¶¶ 142-43.) When Dalton finally got away from Lipsey, she ran crying to a nearby shuttle, which took her to her car. (PPFOF ¶ 321.) A month later, on February 23, 2003, Lipsey and Moore came behind Dalton in the break room, and Lipsey commented that Dalton "had a black woman's ass he'd like to fuck." Lipsey then pulled on Dalton's suit jacket and slapped her on the buttocks. (SPFOF ¶ 137). Further, in late March or early April 2003[6], Davis grabbed Dalton's buttocks and told her "one of these days I'm going to fuck [you]." (Dalton Dep. 9/13/2006 Dep. 344-47.) She reported this incident to Thomas O'Neill, who informed her that "if Wes [Davis] does anything else, I need to know." (*Id.* at 345.)

Dalton complained on several occasions about such sexually inappropriate conduct. For instance, she complained to Sellers in August 2002 about Lipsey's and Moore's comments during training. (PPFOF ¶ 365.) She also complained to Sellers and Fox in November 2002 and January 2003 that Lipsey and others were viewing pornography on various computers at the station. (*Id.* ¶¶ 368, 373, 384.) On February 27, 2003, a meeting was held with Dalton, Sellers, Lipsey, Fox, and Cross regarding Dalton's allegations of sexual harassment. (*Id.* ¶ 387; Dalton 9/13/06 Dep. 331-33.) At the meeting, Dalton recounted several incidents of offensive conduct by Lipsey. (Dalton 9/13/06 Dep. 337-40.)

---

[6] Dalton contends in her brief and proposed findings of fact that this incident occurred in "late June or early July 2003." As pointed out by AirTran, however, this is inconsistent with her own deposition testimony in which she stated that it occurred "end of March, maybe the beginning of April. Somewhere in that time." (Dalton 9/13/06 Dep. 347.)

12

As for station supervisor Tom Cross, Dalton testified that she overheard Cross refer to one of their coworkers as a "slut" and noted that he would openly discuss his sexual exploits. In February 2003, Cross commented in front of Dalton that he wanted to hire a woman whom he recently interviewed because she wore thong underwear and would be "an easy fuck." (PPFOF ¶ 312.) In January and March 2003, Cross openly (and graphically) discussed how his pilot friends would stay at his "crash pad" and that they would go out to the bars and bring women back for sex. (Dalton 9/29/06 Dep. 339-40; Dalton 9/13/06 Dep. 342-43, 353-54.) According to Dalton, Cross expressed contempt for women, at one point yelling at Dalton "what's wrong with women? Can't you fucking women do your job?" In a conversation with Dalton and others in February 2003, Cross stated that women do not belong in the working world and that they just need to shut up. He further said that he "can't wait to get married so I can beat the shit out of my wife. She's good for nothing more than a good fuck." (Dalton 9/13/06 Dep. 341.) In front of Dalton, Cross also referred to female customer service agents as "whores" and "sluts." (SPFOF ¶ 140). In the summer of 2003, Cross commented in front of Dalton about another female coworker's breasts and that he wanted to have sex with her. (Dalton 9/29/06 Dep. 346; DPFOF ¶ 170.) Dalton responded by telling Cross he was disgusting, but she did not report the incident. Dalton also stated that Cross made several harassing comments to Jensen, Dalton's daughter, in front of Dalton. According to Dalton, Cross would call Jensen "a bitch" and "fucking stupid." (PPFOF ¶ 525; DPFOF ¶ 165.)

The record includes additional allegations—Dalton's deposition transcript spans three volumes—but more need not be included at this point to establish that Dalton's work environment was both subjectively and objectively hostile in 2002 and early 2003.

13

For its part, AirTran does not dispute that Dalton and others testified to the harassing incidents described above. Instead, the crux of AirTran's argument is that the key allegations of harassment cited by Dalton are not actionable because they fall outside the limitations period.

Under Title VII, a plaintiff in Wisconsin must file an employment discrimination charge within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5 (e)(1). A hostile work environment qualifies as an unlawful employment practice, see *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007), and "[a] charge of discrimination based on a hostile work environment covers all events during that hostile environment, if the charge is filed within 300 days . . . of the last act said to constitute the discriminatory working condition." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002).

Where a plaintiff can establish that "an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. The Supreme Court adopted this "continuing violation" (or "cumulative violation," see *Lewis v. City of Chicago*, 528 F.3d 488, 493 (7th Cir. 2008)) approach because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117.

Here, Dalton filed her administrative charge with the ERD and EEOC on January 28, 2004. (SPFOF ¶ 43.) Under 42 U.S.C. § 2000e-5(e)(1), the 300-day window

14

reaches back to April 3, 2003. Thus, the parties agree that in order to be timely, Dalton's hostile work environment claim must, at least in part, be based on events that occurred on or after April 3, 2003.

According to AirTran, all of the key incidents of alleged harassment by Davis, Moore, and Lipsey occurred prior to April 3, 2003, and that any alleged harassment by Cross must be considered separately. For support, AirTran notes that Dalton testified during her deposition that she could not recall Davis making any sexually harassing comments to her after late March or early April 2003. (Dalton 9/13/06 Dep. 349-50.) And, Dalton stated in her deposition that she could not recall any sexually harassing activity directed at her by Moore or Lipsey after February 2003. (Dalton 9/29/06 Dep. 308, 310.)

Of note, Dalton's deposition testimony with regard to the timing of certain events is far from clear. This appears to be in part due to the form of the of questions posed and Dalton's admitted inability to remember exact dates (for instance, she recalls the timing of certain incidents based on the changing of the seasons). The parties have selected favorable comments from Dalton's deposition in support of their arguments; thus, in contrast with AirTran's reading of the transcript, Dalton lists several incidents in her response brief that she claims occurred within the 300-day period. (Pl.'s Br. in Opp. to Mot. 15-16.[7]) Upon review of the record, only the following allegations pointed to by Dalton have

_____

[7] Of note, at several points in her brief, Dalton fails to comply with Civil Local Rule 56.2(d) (in effect before February 1, 2010), which provides that "All factual assertions made in any brief must be *supported by both specific citations to evidentiary materials* in the record and the corresponding stipulated fact or proposed finding of fact." Instead, Dalton provides citations only to her proposed findings of facts without reference to the actual evidentiary materials.

15

evidentiary support[8]: (1) in May or June 2003, Dalton observed Lipsey, Moore, and Davis point to an unidentified female coworker and make sexually inappropriate remarks, (Dalton 9/29/06 Dep. 344-45); (2) in May or June 2003, Dalton requested a couple days off and Moore commented to her that if he agreed to take some of her shifts, she should go out with him, (Dalton 9/23/06 Dep. at 309-310); and (3) through July 2003, Davis made several comments to Dalton about her daughter's (Victoria Jensen) body and remarked that he wanted to have sex with her daughter, (Dalton 9/29/06 Dep. 348-49). With regard to Cross, Dalton alleges several instances of harassment, the following of which have evidentiary support[9]: (1) in April 2003, Dalton overheard Cross tell Ms. Ott about "gang banging" a female flight attendant, (Dalton 9/29/06 Dep. 334-35); and (2) through July 2003, Cross kept sexually explicit photos of women in or on his locker, which Dalton described as "pull-outs, from like, Penthouse or Playboy," (Dalton 9/13/06 Dep. 356).

Dalton also asserts that "late June or early July 2003," while in the baggage area, Davis grabbed Dalton when she bent over and told her that "one of these days I'm going to fuck [you]." (Pl.'s Br. 15 (citing PPFOF ¶ 337).) However, this alleged assault by

---

[8] Dalton includes in her brief a number of incidents alleged to have occurred after April 3, 2003, which either misstate the record, rely on inadmissible evidence, or require clarification. For instance, Dalton asserts that "In approximately June 2003, Lipsey and Moore began describing how they enjoyed 'gang banging' women." (Pl.'s Br. 15 (citing PPFOF ¶ 297).) But the only support she points to for this assertion is her own, unverified complaint. In addition, Dalton states that "Moore made sexual comments to Dalton through July 2003." (*Id.* (citing PPFOF ¶ 305)). This statement is unhelpful, and a review of the record indicates that the only incident Dalton recalls after February 2003 regarding Moore is his comment that if he picked up some of her shifts she should go out with him. (Dalton 9/29/06 Dep. 308-10.)

[9] Similar to her assertions of harassment discussed above, Dalton's brief includes misrepresentations regarding the timing of Cross's actions. For instance, Dalton states that "In July 2003, Cross told Ms. Dalton that he couldn't wait until he was married so he could 'beat the shit out of his wife,' saying he hated all women." (Pl.'s Br. at 15 (citing PPFOF ¶ 354).) However, Dalton's deposition testimony reflects that this incident occurred *before March* 2003. (Dalton 9/13/06 Dep. 351.) In addition, Dalton alleges in her brief that "in May 2003, Cross forced Dalton to listen to him graphically describe" certain sexual acts he likes to perform. (Pl.'s Br. 15 (citing PPFOF ¶ 314).) But again, according to Dalton's testimony, this incident occurred *in March* 2003. (Dalton 9/13/06 Dep. 353.)

16

Davis occurred, according to Dalton's own testimony, "the end of March, the first couple days in April" 2003. (Dalton 9/13/06 Dep. 347.)[10]

AirTran replies that, despite Dalton's contrary testimony, none of the allegations listed by Dalton as having occurred on or after April 3, 2003, are "sufficiently linked either in time or in circumstances to the earlier alleged acts of harassment to form part of a single 'unlawful employment practice'" as set out in *Morgan*, 536 U.S. 101. (Def.'s Reply Br. 14.) It asserts that the course of conduct by Lipsey and Moore "essentially stopped with [Dalton's] meeting with Sellers and Lipsey on February 27, 2003." (*Id.*) Any of the later comments by Lipsey and Moore were "separated in time from the earlier alleged conduct, . . . not even about her, . . . and not necessarily harassing in nature." (*Id.*) Hence, according to AirTran, any comments by Lipsey and Moore cannot be viewed as contributing to or reinforcing Dalton's sexual harassment claim. As for Cross's alleged harassment, AirTran asserts that the "allegations of conduct involving Cross are factually distinct" from those involving Lipsey, Moore and others, and therefore cannot be grouped with the conduct of Dalton's coworkers. (*Id.* at 15.) AirTran continues that the allegations regarding Cross are "of his own conduct or words, not of participation by him in behavior by Lipsey or Moore, for example." (*Id.*) It also notes that Cross never engaged in inappropriate physical contact with Dalton, and that the allegations of harassment by Cross were not specifically directed at Dalton. (*Id.* at 15-16.)

---

[10] In her brief, Dalton does not attempt to explain what "the first couple days in April" means. Further, in response AirTran's proposed findings of fact on this point (which refers specifically to Dalton's deposition testimony), Dalton again simply repeats that the incident occurred in June or July, without any authority backing up this assertion. (*See* Pl.'s Response to Def.'s PFOF ¶ 150.)

17

Inasmuch as assertions and reasonable inferences must be construed in Dalton's favor at this point in the proceedings, the court cannot conclude that the alleged harassment ended prior to April 3, 2003. A hostile environment "occurs over a series of days or perhaps years" and claims of a hostile work environment "are based on the cumulative effect of individual acts." *Morgan*, 536 F.3d at 115. Even if certain acts alleged to have occurred after the February 27, 2003, meeting could be, individually, considered more benign than earlier acts, this is not necessarily enough to invoke the limitations period. *Cf. Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (noting that, under the circumstances, an "approximate three-year gap between the discriminatory acts alleged, with the last act occurring entirely by happenstance, was not part of the same hostile work environment"). The court's charge is to look at all the circumstances, *Morgan*, 536 U.S. at 116, and here the record does not indicate any significant temporal gap or other event(s) that would separate the course of harassment in the manner argued by AirTran. Indeed, "[i]t is inappropriate to draw lines by time (that's *Morgan*'s core holding) or by the particular method that the men used to make working conditions worse for the women than for themselves. So it is not possible to rule out reliance on a particular kind of evidence . . . or a particular time during which the hostile environment was manifest." *Bright*, 510 F.3d at 769-70.

In addition, even though later comments by Dalton's coworkers may have focused on other women, this does not necessarily mean they are to be ignored or detached from past events contributing to a hostile environment. In fact, the alleged history of degrading and humiliating conduct by these employees toward Dalton indicates that a similar degrading purpose may have been behind their post-April 3, 2003, comments, even

18

if not necessarily about Dalton. *See Everson v. City of Madison*, — F. Supp. 2d —, No. 08-C-618, 2009 WL 4724283 (W.D. Wis. Dec. 10, 2009). In context, such activity goes beyond simple teasing and offhand comments that have been deemed insufficient to establish a hostile environment. *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998); *see also Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2007) (discussing targeted harassment and "second-hand harassment" in the hostile work environment context); *Smith*, 388 F.3d at 567 (finding no objectively hostile work environment where plaintiff "heard an offensive term directed at a third person once and only learned from others about other offensive comments directed at third persons").

Moreover, the allegations of post-April 3rd harassment are not limited to Lipsey's and Moore's comments. Importantly, Dalton's ambiguous answer regarding the timing of the alleged assault by Davis should not be construed against her at the summary judgment stage. As noted, Dalton stated that the incident may have occurred in "the first couple days of April," and it is apparent from her testimony that she does not know exact date of the incident. In attempting to clarify the timing of this incident, Dalton states "it wasn't snowing anymore . . . [a]nd it was starting to get nice out." (Dalton 9/13/06 Dep. 347.)

Moving on, AirTran's effort to separate Cross's conduct from that of the other alleged harassers fails as it relates to creating a hostile and abusive atmosphere. "Title VII creates responsibilities for 'employers' as entities." *Bright*, 510 F.3d at 768. "If a plaintiff claims that [s]he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach . . .

19

all instances of harassment by all parties are relevant to proving that h[er] environment is sufficiently severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000) (internal citations omitted). While the question of employer liability may require the court to separate conduct of a supervisor from conduct of coworkers, *see Parkins v. Civil Constructors of Ill., Inc*., 163 F.3d 1027, 1032 (7th Cir. 1998), "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive," *Mason*, 233 F.3d at 1045. *See also Isaacs,* 485 F.3d at 386 (noting that the court should not focus on the identities of the alleged harassers—the defendant is the *employer*, the entity responsible for complying with Title VII).

The fourth element of the prima facie case requires that a basis for employer liability exist, regardless of whether the workplace may be considered hostile. "The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker." *Rhodes*, 359 F.3d at 505.

> Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action. Conversely, an employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has been negligent either in discovering or remedying the harassment.

*Id.* at 505-06 (internal citations omitted); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("An employer is not strictly liable for sexual harassment of one worker by another unless, perhaps, the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to

20

have sex with him."). When no tangible employment action results from alleged supervisor harassment, an employer may avoid liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Mason*, 233 F.3d at 1043 n.4.

Here, it appears Dalton is alleging supervisor harassment, as well as coworker harassment.[11] She asserts that she complained on numerous occasions about sexual harassment to her supervisors and that AirTran did not take reasonable steps to prevent or remedy the harassment. On the other hand, Dalton concedes that she did not suffer any tangible employment action related to the alleged hostile work environment, (*See* Pl.'s Br. 21 n.50), and AirTran notes that it had an anti-harassment policy in place. However, AirTran does not articulate how it exercised reasonable care to prevent or remedy any sexual harassment in light of Dalton's claims—its position, for summary judgment purposes, appears to rest on Dalton's inability to establish that the alleged harassment was sufficiently severe or pervasive so as to create a hostile or abusive atmosphere. Therefore, a question of material fact exists on this point.[12]

---

[11] Whether Cross qualifies as a "supervisor" for Title VII purposes is not clear. *See Parkins,* 163 F.3d at 1033 (noting that courts "consistently distinguish[] employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers").

[12] AirTran discusses employer liability in its opening brief (reciting the standard for liability based on for both coworker and supervisor harassment and relevant defenses), but it does not attempt to tie the allegations in this case to any defense it may have on this point. (*See* Def.'s Br. in Supp. 14-22.)

21

Because a jury could conclude that Dalton's work environment was pervasively hostile and that AirTran did not take appropriate steps to stop the alleged sexual harassment, this claim may go forward.

## B. Retaliation

"Title VII forbids an employer from discriminating against an employee who has 'opposed any practice' made unlawful by Title VII." *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 838 (7th Cir. 2009). "A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method." *Roby v. CWI, Inc.*, 579 F.3d 779, 786-87 (7th Cir. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006).

"Under the direct method, a plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between them." *Scruggs*, 508 F.3d at 838. Alternatively, "a plaintiff proceeding under the indirect method establishes a prima facie case by establishing the first two elements, as well as: (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Id*. (citing *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) and *Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park,* 490 F.3d 558, 562 (7th Cir. 2007)).

"If the plaintiff succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action. *Id*. (citing *Stephens*, 569 F.3d at 787). "If the defendant does so, the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to

22

avoid the entry of summary judgment against it.  *Id.* (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).  "'An employee's failure to cast doubt on an employer's nonretaliatory explanation' means a claim fails under either the direct or indirect method." *Id.* (quoting *Argyropoulos*, 539 F.3d at 736 n.6).

In this case, it appears that Dalton proceeds under the direct method. AirTran does not dispute that Dalton engaged in a protected activity by complaining about harassment.  Thus, the parties focus on whether (1) Dalton suffered a materially adverse action; and (2) a causal connection exists between the alleged adverse action and her complaints.

Dalton asserts that AirTran took several unlawful actions, over several months, in response to her complaints.  First, Dalton contends that "after February 2003 when [she] had complained about her sexual assault by Lipsey and Moore, Sellers frequently exiled her and Henneman to the baggage room . . . so that the men did not have to work around them or talk to them."  (Pl.'s Br. 24.)  She also states that four or five times, Sellers "forced" Dalton to drive home and change clothes to work the ramp when they were short on personnel.[13]  She asserts this is an adverse employment action because working the bag room was more physically difficult than other assignments.  In addition, she contends that "Sellers comments about protecting the male employees from further

---

[13] Dalton asserts in her brief that Sellers forced her to drive home without reimbursement to change her clothes to work where male employees were not working.  (Pl.s' Br. at 24 (citing PPFOF ¶ 425).)  However, it appears that she misstates her own testimony.  The only thing Dalton testified to on this point is that, while prepared to work the ticket counter, she was instructed four or five times to change clothes to work the ramp when AirTran was short of personnel.  She complained that men would sometimes be permitted to work the ticket counter in the same clothes that they would wear for the ramp, but that women had to wear more professional clothes at the ticket counter.

complaints by isolating the women establish a causal link between the disparate work assignments and Ms. Dalton's complaints of discrimination and harassment." (*Id.*)

Boiled down, Dalton's first allegation of retaliation concerns assignments that she previously worked and that were part of her general duties as a customer service agent. This is insufficient. "A materially adverse action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hobbs v. City of Chicago,* 573 F.3d 454, 463-64 (7th Cir. 2009) (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009)). Further, the portions of the record on which Dalton relies indicate that such assignments were made in an effort to stop harassment of Dalton. (Dalton 9/13/06 Dep. 343-44; Dalton 9/28/06 Dep. 389-94.)

Next, Dalton asserts that "Defendant falsified Ms. Dalton's attendance records, but not those who had not complained." (Pl.'s Br. 25.) She later ties this in to AirTran's decision to select Dalton for furlough in October 2003, for which AirTran noted her attendance record. She contends that she received an attendance award in October 2002, and that she was never disciplined until she started complaining. Dalton adds that she was intimidated by Cross into signing the "false" discipline reports, which shows "direct evidence of causation." (Pl.'s Br. 26.)

However, Dalton's charge that AirTran falsified her attendance records is not supported by the record. The only backup for this assertion is Dalton's testimony that her Employee Discipline Reports (EDRs) from February, March, and May 2003 indicate that she was out sick when instead she submits that she was out visiting her mother in the hospital. (*See* SPFOF ¶¶ 91-95; PPFOF ¶¶ 430-31.) And, Dalton admits that the EDRs accurately reflect that she was absent from work on the days specified. (SPFOF ¶¶ 91-94.)

24

How this proves that AirTran falsified records or otherwise subjected Dalton to a materially adverse action is unclear.  *See Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (noting that the plaintiff's complaints "of negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . are not adverse employment actions actionable under Title VII").  Further, simply stating that she was not disciplined until she started complaining is not sufficient to establish a causal connection, see *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (noting that "suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial"), and in any event, this contention is inconsistent with the record.

Dalton next asserts that in the summer of 2003, Moore, after learning that she complained about harassment, commented to her "Why don't you fucking leave?  Nobody fucking wants you here."  (Pl.'s Br. 26; Dalton 9/29/06 Dep. 296-303.)  She further states that she witnessed Moore say threatening things about Henneman.  Dalton adds that such comments "would dissuade a reasonable employee from complaining about discrimination . . . and shows a pattern of antagonism following Ms. Dalton's complaints, showing causation."  (Pl.'s Br. 27.)  However, assuming such conduct would deter a reasonable employee from making or supporting a charge of discrimination, see *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006), this does not speak to retaliation by AirTran.  AirTran "is liable for harassment by coworkers, whether discriminatory or retaliatory, only if it negligently fails to take proper preventive or corrective measures.  *Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006).  Dalton does not attempt to show how Moore's statements tie into unlawful retaliation by her employer, and without more she cannot establish a material issue of fact on this point.

25

Moving on, Dalton submits that Fox admonished her for complaining of harassment by telling her "'you need to keep your mouth shut' about Lipsey's attacks." (Pl.'s Br. 27.) Further, Fox is alleged to have said "we will make it hard on you [if you] don't shut your mouth." (Pl.'s Br. 27; PPFOF ¶ 435.) Dalton contends that this threat of consequences by a supervisor would dissuade a reasonable person from complaining about harassment.

As to the last point, Dalton is correct—such conduct by a supervisor would likely dissuade a reasonable person from complaining of harassment. However, Dalton misrepresents the record. A review of her testimony on this point reveals that, in this alleged discussion, Fox was not admonishing Dalton because she was complaining of harassment, but because Dalton was telling other employees about such comments and not AirTran's management. (Dalton 9/28/06 Dep. 290-91.) In that context, Fox's comments are not tied to any protected activity by Dalton.

Dalton next asserts that "after her January 2003 back injury, [she] was forced to have her doctor remove her restrictions in order to return to work and participate in the new bid. [PPFOF 436] Ms. Dalton was never allowed to return to work on light duty at the Defendant after July 25, 2003. [PPFOF 264-71, 75-76, 437-39]." (Pl.'s Br. 27.) She then states that male employees and other female employees who had not complained were allowed to work light duty, often for weeks or months at a time." (*Id.*) However, again, the record does not support Dalton's arguments. With regard to being "forced" to have her doctor remove her restrictions (which relate to lifting, pulling, pushing, bending, (Dalton 9/13/06 Dep. 134)), Dalton's testimony indicates only that she was told she would not be permitted to bid on new work assignments if she had medical restrictions. Therefore,

26

Dalton asked her doctor to lift the restrictions.  (Dalton 9/13/06 Dep. 135-36.)  She testified that she was not sure when she worked with her medical restrictions prior to the bidding period, but that when she worked, Sellers was "fine with it" and had her assigned to the ticket counter.  (Dalton 9/13/06 Dep. 135-38.)

Dalton is unable to reasonably tie her allegations regarding light work to any protected activity.  She has stated that she complained about harassment when she started at AirTran, but apparently was permitted to work light duty in October 2002 and January 2003.  And, her concern with not being assigned light work after July 25, 2003, does not appear connected to any specific protected activity.[14]  Further, Dalton's medical restrictions, imposed following her shoulder injury of July 23, 2003, limited her to using her right arm only.  (SPFOF ¶ 111.)  As "light duty" appears to be an amorphous concept that simply refers to assignments with reduced physical labor, the provision of light duty at any given time depends on the ability of the injured agent to function as a member of the work crew and the needs and demands of the business.  Her remark that "male and other female employees who had not complained were allowed to work light duty" at various times and with various on-the-job injuries is unhelpful as it does not speak to AirTran's ability to offer light duty to Dalton given her limitations at the time she was seeking light duty.  On top of that, the record reflects that the station managers at the Milwaukee Station started limiting light duty assignments in early 2003 after being informed that such assignments were hampering efficiency.  (DPFOF ¶ 49-50.)

---

[14] If Dalton is attempting to tie the denial of light duty work after July 2003 to her meeting with Sellers and Lipsey in February 2003, the five month gap defeats any reasonable connection between the two.  *See Longstreet*, 276 F.3d at 384 (noting that four month gap between complaints of harassment and transfer is insufficient to establish causation).

Moving on, Dalton contends that she was denied medical treatment in retaliation for her complaints. She states that she was injured in July 2003 "but Cross would not allow her to leave work to seek medical attention at Concentra and instead required her to work the ramp until she finally saw her own doctor." (Pl.'s Br. 28) This, according to Dalton, would be considered a materially adverse action by a reasonable employee. (Pl.s' Br. 28.) Also, Dalton asserts that after she filed a complaint with the ERD, her worker's compensation stopped and "I was told I wasn't getting surgery."

AirTran disagrees with everything asserted by Dalton except that she was injured in July 2003. But, assuming these claims are true, Dalton does not tie denial of medical attention to any protected activity—she simply asserts that because one event occurred after the other, there is causation. This type of evidence has been deemed insufficient repeatedly. *See Argyropoulos*, 539 F.3d at 734 (noting that "timing, standing alone, 'will rarely be sufficient to create a triable issue'" (quoting *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005)); *Longstreet*, 276 F.3d at 384; *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation."); *Stagman v. Ryan*, 176 F.3d 986, 1001 (7th Cir. 1999) (same). The same goes for Dalton's allegation that "I was told I wasn't getting surgery" after she complained. Dalton makes does not explain who made the decision not to do surgery, whether there is a medical opinion that she needed surgery, or how the decision to deny her surgery stems from her ERD complaint. (*See* Dalton 9/29/06 Dep. 407.)

28

Finally, Dalton asserts that she was retaliated against by being selected for furlough. She claims that she had a better attendance record and more seniority than other employees who had not complained and were not selected for furlough.[15]

There is no question that by being laid off, Dalton suffered an adverse employment action. She was one of six employees selected for furlough in October 2003. Four of those six employees (Carrie Jackson, Duane Lettow, Michelle Roska, and Virnita Wilturner) did not complain of harassment, (DPFOF ¶¶ 65-66; Fox Decl. ¶¶ 46-48.), and several other employees that did complain of harassment (Henneman, Ott, and Cain) were not selected for furlough, (SPFOF ¶¶ 37-39). Plus, Dalton and Jensen were subsequently recalled to work on March 2, 2004. (SPFOF ¶ 40-41.) These facts damage Dalton's ability to show that AirTran retaliated against her during the furlough and rehiring process. *See Sauzek*, 202 F.3d at 918 (rejecting plaintiff's retaliation claim and noting that the defendant recalled to work several employees who had filed EEOC complaints). Further, Dalton's only evidence tying her complaints (though she does not point to any particular complaint) and her furlough is timing. As noted earlier, "the mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek*, 202 F.3d at 918 (7th Cir. 2000) (citing *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir.1998)); *Brown v. Illinois Dept. of Natural Resources*, 499 F.3d 675, 685 (7th Cir. 2007) (noting that "timing alone is insufficient to establish a genuine issue of material fact to

---

[15] Dalton also contends that AirTran has presented inconsistent and shifting reasons for Dalton's layoff (which she does not further explain), and that she has direct evidence of illegal motive to get rid of her (which she does not further explain). The court is not inclined search the record for evidence in support of the plaintiff's claims, and without more such vague assertions will not be considered. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("We have repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

29

support a retaliation claim" (quoting *Kampmier*, 472 F.3d at 939 (7th Cir. 2007))). Hence, because Dalton is unable to establish a prima facie case of retaliation, AirTran's motion for summary judgment on this claim is granted.

### C. Family and Medical Leave Act

Dalton charges in her complaint that AirTran "intentionally denied Plaintiff the ability to exercise her rights under the Family & Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq." (Compl. ¶ 48.) In response, AirTran asserts, among other things, that this claim is untimely.

Pursuant to 29 U.S.C. § 2617(c)(1), an FMLA claim must be brought within two years of the last event constituting the alleged violation. Dalton concedes that her complaint in this action was filed more than two years after she was allegedly denied of FMLA leave, but offers that a three-year statute of limitations applies because AirTran committed a "willful violation" of her rights under the FMLA. 29 U.S.C. § 2617(c)(2). Courts have interpreted the standard for willfulness as either a knowing violation of the FMLA or actions taken with reckless disregard for the employee's rights under the FMLA. *See Solorzano v. Railway & Indus. Servs.*, Inc., No. 09-C-3733, 2010 WL 234972 (N.D. Ill. Jan. 15, 2010) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)); *Fialho v. Girl Scouts of Milwaukee Area, Inc.*, No. 06-C-1218, 2007 WL 1246433 (E.D. Wis. April 30, 2007); *Artis v. Palos Cmty. Hosp.*, Case No. 02-C-8855, 2004 WL 2125414 (N.D. Ill. Sept. 22, 2004).

To support her assertion that she is entitled to a three-year statute of limitations, Dalton simply notes that she claimed an "intentional" violation in her complaint.

30

(Pl.'s Br. 30.[16]) This is not enough. Dalton makes an additional argument that she relied on AirTran's "misrepresentations" regarding FMLA, but this does not speak to a knowing, willing, or reckless violation of Dalton's rights.[17] Without more, Dalton cannot survive summary judgment on her FMLA claim. Therefore, upon review of the record,

IT IS ORDERED that AirTran's Motion for Summary Judgment (Doc. # 21) is granted in part and denied in part.

A status conference in the above matter is set for Thursday, April 15, 2010, at 11:00 AM.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

---

[16] The entirety of Dalton's argument on this point: "Ms. Dalton's Complaint alleges that Defendant intentionally disregarded her FMLA rights, and the evidence shows a Defendant familiar with FMLA. This entitles Ms. Dalton to the 3-year limit for willful violations." (Pl.'s Br. 30.)

[17] Dalton's claim as to how Air Train interfered with her rights under the FMLA is a bit unclear—she apparently informed AirTran that she intended to take FMLA leave to care for her mother, but injured her shoulder around the time that she intended to take the previously requested leave. (Pl.'s Br. 30.) Dalton never informed AirTran that she needed or wanted FMLA leave for her shoulder injury. (Dalton 9/29/06 Dep. 441-42.) In addition, it appears that AirTran had a policy consistent with the FMLA, but Dalton was not an eligible employee for the purposes of the FMLA inasmuch as AirTran never employed more than 49 people within 75 miles of the worksite. *See* 29 U.S.C. § 2611(2)(B)(ii).

31